UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| BELLISIO FOODS, INC., | Case No. 07-CV-4520 (PJS/JJG) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| PRODO PAK CORP. and JOHN W. MUELLER, | |
| Defendants. | |

George G. Eck and Mariah L. Reynolds, DORSEY & WHITNEY, LLP, for plaintiff.

Elizabeth A. Mikesell and Bryan R. Battina, BOCK & BATTINA, LLP, for defendants.

Plaintiff Bellisio Foods, Inc. ("Bellisio") brings this breach-of-contract action against defendants Prodo Pak Corp. ("Prodo Pak") and John W. Mueller. Defendants contend that the Court lacks personal jurisdiction over them and move to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure. Defendants further contend that if the Court denies their motion to dismiss, it should transfer venue under 28 U.S.C. § 1406(a) to the United States District Court for the District of New Jersey. For the reasons that follow, the Court grants defendants' motion to dismiss and denies as moot their alternative motion to transfer.

I.  BACKGROUND[1]

Bellisio is a Minnesota company that manufactures prepared foods. Bellisio's corporate headquarters is apparently located in Minneapolis, Minnesota (although the company's Chief Financial Officer, Thomas W. Knuesel, maintains offices in Duluth, Minnesota). Knuesel Aff.

---

[1]The facts are largely undisputed. To the extent that any dispute of fact exists, the Court recounts the facts in the light most favorable to Bellisio.

¶¶ 3, 7 [Docket No. 24]. An affiliated manufacturing company, Arden International Kitchens, LLC ("Arden"), is located in Lakeville, Minnesota. Shoquist Aff. ¶¶ 1-2 [Docket No. 25]. Bellisio also had offices in Ohio during the period relevant to this suit.[2]

Prodo Pak manufactures packaging machines. Mueller serves as its president. Prodo Pak is incorporated under Delaware law, but it is located in New Jersey, which is also where Mueller lives. Mueller Aff. ¶¶ 3, 6 [Docket No. 17-4].[3]

In 2006, Bellisio was in the market for a new machine that could package sauces and pastes into portion-sized tubes and packets. In late September 2006, Mueller provided a proposal to supply such a machine to Mike Banovetz, a vice president of engineering at Bellisio. Battina Aff. Ex. A, Ex. B at 14 [Docket No. 17]. Mueller addressed the proposal to Banovetz at Bellisio's Ohio location. Battina Aff. Ex. A.

The proposal quoted a "total system price, ex works Garfield, New Jersey" of about $156,000. *Id.* at 28.[4] The proposal's boilerplate likewise said that quoted prices "[a]re generally f.o.b. Garfield, N.J., otherwise as specified in the quotation." *Id.* at 36. With respect to delivery,

---

[2]The documents in the record refer to Bellisio's Ohio office as belonging to Michelina's, Inc. Bellisio and Michelina's are, however, apparently the same corporate entity. Michelina's changed its name to Bellisio some time after the events underlying this action. Joint Rule 26(f) Rep.¶ 1(b) [Docket No. 5]. The Court will refer to plaintiff as "Bellisio" throughout this opinion.

[3]Mueller's affidavit was docketed as the fourth attachment to the affidavit of defendant's counsel, Bryan R. Battina [Docket No. 17]. The Battina affidavit itself, however, does not indicate that Mueller's affidavit is attached. Mueller's affidavit also purports to have two attachments, labeled exhibits A and B. In fact, those two exhibits are referenced by, and attached only to, the Battina affidavit.

[4]The quoted text is in all capital letters in the original. Throughout this opinion, the Court uses upper- and lowercase letters in quotations to improve legibility, regardless of whether the quoted text appeared in all capital letters in the original.

the proposal did not specify a destination, but instead said: "Ex. factory, Garfield, New Jersey approximately 16 to 20 working weeks from receipt of firm order and down payment." *Id.* at 34. And a section of boilerplate titled "Acceptance of Orders" included this provision:

> This agreement and any purchase or sale arising hereunder shall be governed, construed, and interpreted in all respects in accordance with the laws of the State of New Jersey. Any litigation concerning this agreement shall be under the jurisdiction of a state or federal court located within New Jersey.

*Id.* at 37.

Mueller had some additional contact with Banovetz in October and November 2006. Battina Aff. Ex. B at 14. Apparently, though, Bellisio eventually decided not to purchase the machine quoted in Prodo Pak's proposal of September 2006.

In early December, Mueller emailed Banovetz and offered to sell Bellisio a different machine — this one used, rather than new — for $95,000. Knuesel Aff. Ex. A. Banovetz responded by email on December 21 and offered to pay $75,000. *Id.* A few hours later, Mueller replied that he would have to check with the machine's owner. (Mueller was acting as a middleman.) Battina Aff. Ex. B at 9. Mueller also asked Banovetz for his address so that Mueller could send him a video of the machine. *Id.* Banovetz replied that afternoon by providing his address at Bellisio's Ohio facility, and Mueller shipped the video to Ohio that day or the next. *Id.* at 8.

Later in the afternoon of December 21, Mueller emailed Banovetz to say that the machine's owners would take $82,500 for it. Knuesel Aff. Ex. B. The next day, Joel Conner, Bellisio's chairman and CEO, emailed Mueller and offered $80,000. *Id.* This is the first communication in the record between Conner and Mueller. Although Conner is based in

-3-

Minneapolis, his email to Mueller gave no clue about his location or about where the machine should be delivered. *Id.*[5]

Five days later, Mueller accepted Conner's $80,000 offer by email. Knuesel Aff. Ex. C at BFI 100002-03. Although Mueller sent his email to Conner, the body of the message was addressed to "Mike" — that is, to Banovetz. *Id.* Conner responded by email a few minutes later, saying "Tom Knuesel will coordinate payment . . . . please confirm receipt." Conner's signature block included his phone number, which began with the area code for Minneapolis (612). *Id.* As far as the record reflects, this is the first time that Mueller received even a hint that Bellisio might have operations outside of Ohio, and it was a rather obscure hint at that.

The next day — December 27, 2006 — Knuesel completed a wire transfer of $80,000 to Prodo Pak. Knuesel Aff. ¶ 5; Knuesel Aff. Ex. C at BFI 1000002 ("FYI, funds wired today."). Shortly afterward, Conner told his employees to have the machine shipped to Arden, and later the same day an employee asked Banovetz, "Has someone already made shipping arrangements?" *Id.* at BFI 1000001.

On the morning of January 3, 2007, Banovetz emailed Mueller to follow up on Bellisio's order for the machine. Knuesel Aff. Ex. D. (Banovetz had apparently been on vacation when Conner and Mueller were negotiating the final price by email.) Banovetz told Mueller: "We will be shipping [the machine] to Lakeville, Minnesota." *Id.* Later that afternoon, Banovetz responded to the December 27 internal email about shipping arrangements to say that he did not know what arrangements had been made. Knuesel Aff. Ex. C at BFI 1000001. Banovetz copied

---

[5]The email from Conner has the subject line "Re: Fw: Used Prodo-Pak Model PV 215" and the body, in its entirety, reads: "Our offer is $80,000 and we can execute on Tuesday AM." Knuesel Aff. Ex. B.

Mueller on this email and included a string of internal emails, including the email in which Conner directed that the machine be shipped to Arden. *Id.*

Through these emails on January 3, Mueller learned for the first time that the machine he had committed to sell to Bellisio, and for which Bellisio had already paid, was intended for Arden in Lakeville, Minnesota. Knuesel and Daniel Shoquist, a purchaser at Arden, both imply in their affidavits that Mueller learned the intended place of delivery earlier. Knuesel says: "It is my understanding that Defendants promised to deliver [the machine] to . . . Lakeville, Minnesota, within four to six weeks from their receipt of the $80,000 wire transfer." Knuesel Aff. ¶ 5. Similarly, Shoquist says: "It was my understanding that [the machine] would be delivered to . . . Lakeville, Minnesota within four to six weeks after Defendants received payment from Bellisio Foods, Inc." Shoquist Aff. ¶ 4. But these statements are not competent evidence of when Mueller knew that the machine was bound for Minnesota, because Knuesel and Shoquist claim to have only an "understanding," and not personal knowledge, of when Mueller agreed to ship the machine to Arden. *Cf.* Fed. R. Civ. P. 56(e)(1) (providing, with respect to summary-judgment motions, that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). Indeed, implicitly recognizing the weakness of these affidavits, Bellisio's counsel conceded at oral argument that Mueller did not learn of the machine's destination until January 3, 2007.

From January through early March 2007, Shoquist had several phone conversations with Mueller and his secretary about delivery of the machine. Shoquist Aff. ¶ 6. In late February or early March, however, Mueller told Shoquist that he would be unable to deliver the machine

because its owner, an Australian company, had sold it to someone else. *Id.* ¶ 7. Mueller promised to return Bellisio's $80,000 payment. *Id.* ¶ 8. Knuesel then followed up by email on March 22 and April 4, asking Mueller to return the $80,000 and providing him the bank information necessary to complete a wire transfer to Bellisio. Knuesel Aff. Ex. E.

Mueller did not refund Bellisio's money. In June 2007, Bellisio filed this suit in state court, and Prodo Pak and Mueller removed it to this Court.

## II.  ANALYSIS

### A.  Personal Jurisdiction

#### 1.  General Principles

Defendants have moved under Rule 12(b)(2) to dismiss for lack of personal jurisdiction.[6] When personal jurisdiction is contested, the plaintiff must ultimately prove, by a preponderance

---

[6]Rule 12(b) provides that a motion asserting any of the defenses listed in that section — including the defense of lack of personal jurisdiction — "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Rule 12(b) thus suggests that if a defendant seeks to challenge the personal jurisdiction of the court, the defendant must do so in a motion brought before it files an answer. *See* 10A Charles Alan Wright et al., *Federal Practice and Procedure: Civil* § 1361 at 93 (3d ed. 1998) ("A strict interpretation of the timing provision's language leads to the conclusion that the district judge must deny any Rule 12(b) motion made after a responsive pleading is interposed as being too late.") In this case, defendants filed an answer before moving to dismiss. Arguably, then, they waived their personal-jurisdiction defense.

As this Court has explained elsewhere, though, such a reading of Rule 12(b) is at odds with other sections of Rule 12, which suggest that a defendant does not have to assert a personal-jurisdiction defense by raising it in a pre-answer motion, but instead can preserve the defense by including it in the answer. *See Pope v. Elabo, GmbH*, No. 06-CV-0516 (PJS/JJG), slip op. (D. Minn. Nov. 4, 2008). Bellisio has not argued that Prodo Pak or Mueller filed its motion too late, but, even if Bellisio had done so, "federal courts have allowed untimely motions if the defense has been previously included in the answer." 5C Charles Alan Wright et al., *Federal Practice and Procedure: Civil* § 1361 at 93-94 (3d ed. 2004) (footnote omitted). Prodo Pak and Mueller included the defense of lack of personal jurisdiction in their answer, *see* Ans. to Second Am. Compl. ¶ 13 [Docket No. 14], and they have done nothing to waive that defense under Rule 12(h)(1). Thus the Court finds that they are not precluded from asserting the defense.

of the evidence, facts establishing that the court has personal jurisdiction over the defendant. *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991). But the plaintiff need not do so "until trial or until the court holds an evidentiary hearing." *Id.* When a district court considers only affidavits or other written evidence in connection with a Rule 12(b)(2) motion, the plaintiff need only make a "prima facie showing" of jurisdiction. *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974); *see also Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (citing *Block Industries*). But the plaintiff attempting to make this prima facie showing — like the defendant seeking dismissal — cannot rely on pleadings alone. Instead, the parties must present affidavits or other evidence outside of the pleadings. *Block Indus.*, 495 F.2d at 260 ("The 'prima facie showing' must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto."). In weighing that evidence, "the court must look at the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in favor of that party." *Dakota Indus.*, 946 F.2d at 1387 (citation omitted). As long as there is "some evidence upon which a prima facie showing of jurisdiction may be found to exist," the Rule 12(b)(2) motion will be denied. *Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 (8th Cir. 1977); *see also Watlow Elec. Mfg. Co. v. Patch Rubber Co.*, 838 F.2d 999, 1000 (8th Cir. 1988) (citing *Aaron Ferer & Sons*).

As a general rule, a federal court sitting in diversity can exercise personal jurisdiction over a defendant only if doing so comports with both the long-arm statute of the state in which the federal court is located[7] and the Due Process Clause of the Fourteenth Amendment. *See*

---

[7]The requirement that the exercise of personal jurisdiction must be consistent with the
(continued...)

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 463 (1985); *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 561 (8th Cir. 2003); *see also Pope v. Elabo, GmbH*, No. 06-CV-0516 (PJS/JJG), slip op. at 9 n.7. (D. Minn. Nov. 4, 2008). Because Minnesota's long-arm statute (Minn. Stat. § 543.19) reaches as far as the Constitution allows, the Court need only consider whether exercising personal jurisdiction over Prodo Pak and Mueller is consistent with due process. *See Minn. Mining & Mfg. Co. v. Nippon Carbide Indus. Co.*, 63 F.3d 694, 697 (8th Cir. 1995); *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410-11 (Minn. 1992).

The Supreme Court held in *International Shoe Co. v. Washington* that exercising jurisdiction over a defendant is constitutionally permissible only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This formulation suggests an equivalence between "minimum contacts" and "fair play and substantial justice" — that is, it implies that the "minimum" level of contacts constitutionally required to support personal jurisdiction equals the level of contacts called for by "traditional notions of fair play and substantial justice."

Subsequent Supreme Court cases, however, have clarified that "minimum contacts" and "fair play and substantial justice" are separate, though related, requirements. Specifically, *Burger King Corp. v. Rudzewicz* explained: "*Once* it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction

---

[7](...continued)
forum state's long-arm statute is imposed by Rule 4(k) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 4(k).

would comport with fair play and substantial justice." 471 U.S. 462, 476 (1985) (emphasis added; quotations omitted). Put another way, minimum contacts alone will not support personal jurisdiction if, because of other factors, the exercise of jurisdiction would not "comport with fair play and substantial justice" — that is, if exercising jurisdiction would be unreasonable. *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113-16 (1987) (part II-B); *Burger King*, 471 U.S. at 477-78 ("[M]inimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities."); *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 374 (8th Cir. 1990).

Thus, a federal court must engage in a two-part analysis in determining whether it has personal jurisdiction over a defendant in a diversity case. First, the court must determine whether the defendant has minimum contacts with the forum state. If it does not, the analysis is at an end; the court cannot exercise jurisdiction. If it does, the court moves to the second step of the analysis: determining whether the exercise of jurisdiction over the defendant would "comport with fair play and substantial justice." *Burger King,* 471 U.S. at 476 (quotations omitted). The first step might be referred to as the "minimum contacts" analysis, while the second step might be referred to as the "reasonableness" analysis.

### a. Step One: Minimum Contacts

To determine whether minimum contacts exist, a court must focus on the defendant's actions: "[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Id.* at 474. A corollary of this principle is that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Hanson v. Denckla*, 357 U.S.

235, 253 (1958); *see also Burger King*, 471 U.S. at 474 (quoting *Hanson*). It follows that even if it was foreseeable to a defendant that a third party's actions would bring the defendant's product into a foreign state where the product might injure someone, personal jurisdiction in that state cannot be based solely on such foreseeability. *Burger King*, 471 U.S. at 474; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295-96 (1980).

Instead, personal jurisdiction arises only if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297; *see also Burger King*, 471 U.S. at 474. This statement, however, is nothing more than a conclusion. It provides that personal jurisdiction arises if the defendant reasonably anticipates being haled into a state's courts, but that begs the question of when a defendant *should* reasonably anticipate being haled into a state's courts. What is missing is an explanation of what kind of activities create a reasonable expectation of being "haled into court."

That explanation is found in the Court's "purposeful availment" requirement: "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson*, 357 U.S. at 253; *Burger King*, 471 U.S. at 475 (quoting *Hanson* and discussing "'purposeful availment' requirement"). The purposeful-availment requirement is therefore the key requirement that, if met, establishes that a defendant has minimum contacts with a forum.

It follows from the purposeful-availment requirement that "a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (citations

-10-

and quotations omitted). The insufficiency of such contacts or activities to support jurisdiction is not an independent jurisdictional principle. Rather, such insufficiency is a consequence of — that is, a necessary corollary of — the purposeful-availment requirement. A defendant whose contacts with a state are entirely random, fortuitous, or attenuated by definition has not purposefully availed itself of the benefits and protections of the state's laws.

*b. Step Two: Reasonableness*

Having satisfied itself that the purposeful-availment requirement is met and thus that the defendant has minimum contacts with the forum state, the court must, in the second step of the analysis, ask whether the exercise of personal jurisdiction over the defendant would nevertheless be so unreasonable as to violate the Due Process Clause. The Supreme Court has identified five factors that are relevant to reasonableness: (1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in efficient dispute resolution; and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen*, 444 U.S. at 292; *see also Asahi Metal*, 480 U.S. at 113 (citing *World-Wide Volkswagen*). In particular, the first of these factors — the burden on the defendant — is to be weighed against the other four in assessing the reasonableness of exercising personal jurisdiction over the defendant. *World-Wide Volkswagen*, 444 U.S. at 292.

These five reasonableness factors must then be considered in conjunction with the defendant's contacts with the forum. If the reasonableness factors point toward jurisdiction — for instance, if the burden on the defendant is light while the plaintiff's and forum's interests are substantial — then personal jurisdiction will comport with due process even if the defendant's contacts with the jurisdiction are relatively few. *Burger King*, 471 U.S. at 477. But if the

reasonableness factors point strongly away from jurisdiction, this "may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." *Id.* at 478. Instances in which jurisdiction is unreasonable despite purposeful availment by the defendant will likely be rare, however, because "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477 (emphasis added); *see also Asahi Metal*, 480 U.S. at 114 ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").

It follows from these various rules and principles that whether personal jurisdiction comports with due process can be analyzed by asking: First, did the defendant purposefully avail itself of the benefits and privileges of conducting activities in the forum? (This is the "minimum contacts" part of the analysis.) If not — if the defendant's contacts were fortuitous or resulted from a third party's actions (i.e., were attenuated) — then the court lacks personal jurisdiction over the defendant. But if the purposeful-availment requirement is met, the second question is: Has the defendant provided a compelling reason why jurisdiction would be unfair — that is, has the defendant shown that the burdens on it far outweigh the interests of the forum, the plaintiff, and the judicial system? (This is the "reasonableness" part of the analysis.) If not, then the Due Process Clause permits the court to exercise personal jurisdiction over the defendant.[8]

---

[8]The Eighth Circuit regularly lists the following five factors to be considered in personal-jurisdiction cases: (1) the nature and quality of the defendant's contacts with the forum; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (4) the forum state's interest in the case; and (5) the convenience of the parties. *See, e.g., Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004); *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE)*

(continued...)

2. Application of General Principles

Bellisio contends that Prodo Pak and Mueller had extensive contacts with Minnesota in connection with the aborted sale of the packaging machine. But almost all of those contacts took place *after* Bellisio and Prodo Pak had already entered into a contract for sale of the machine. Those post-contract contacts do not show that defendants purposefully availed themselves of the privilege of doing business in Minnesota.

All of the initial negotiations between Prodo Pak and Bellisio were conducted between Banovetz, in Ohio, and Mueller, in New Jersey. There is no evidence that Mueller had any idea, before he committed to sell a used packaging machine to Bellisio and accepted payment for that machine, that Bellisio had a plant in Minnesota.

Indeed, to the extent that the record discloses defendants' expectations about where a contract of sale might be performed, there is evidence that Prodo Pak intended to perform in New

---

⁸(...continued)
*Ltd.*, 89 F.3d 519, 522-23 (8th Cir. 1996). The Eighth Circuit has not explained precisely how these factors relate to the two distinct analyses — minimum contacts and reasonableness — required by the Supreme Court, but it has described the first three factors as primary and the latter two as secondary. *See, e.g.*, *Digi-Tel*, 89 F.3d at 523.

It appears to this Court that the first two Eighth Circuit factors go primarily to whether minimum contacts exist between the defendant and the forum. In other words, to determine — as the Supreme Court requires — whether a defendant has purposefully availed itself of the privilege of conducting activities in the forum, a court must look at the quantity and quality of the defendant's contacts with the forum. It also appears that the fourth and fifth factors go to the reasonableness of exercising jurisdiction. Indeed, these two factors are already subsumed within the five factors that the Supreme Court has said must be considered in assessing reasonableness. *See World-Wide Volkswagen*, 444 U.S. at 292; *see also Asahi Metal*, 480 U.S. at 113. The third factor, as the Eighth Circuit has explained, merely distinguishes general from specific jurisdiction. *See, e.g., Digi-Tel*, 89 F.3d at 523 n.4.

Because the Eighth Circuit's five-factor test simply restates some of the factors identified by the Supreme Court, the Court will not separately address the Eighth Circuit's formulation. Needless to say, though, as this Court undertakes the analysis dictated by the Supreme Court, each of the factors identified by the Eighth Circuit will be considered.

Jersey. In its initial proposal to Banovetz, Prodo Pak offered to sell the machine to Bellisio "f.o.b." or "ex works" Garfield, New Jersey. Battina Aff. Ex. A. at 28, 34, 36. Such terms would have obligated Prodo Pak to deliver the machine in New Jersey, not elsewhere. *See, e.g., Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819-20 (8th Cir. 1994).[9] The machine's *ultimate* destination was, therefore, a matter of indifference to Prodo Pak under the initial proposal. Further, the proposal specified that any related litigation would take place in New Jersey. Although the proposal was not accepted by Bellisio, it provides some evidence about defendants' expectations with respect to the contract that the parties eventually entered. Specifically, the proposal provides support for the proposition that defendants (at least initially) did not expect to be haled into court outside of New Jersey, let alone in Minnesota.

Of course, Bellisio did not ultimately agree to buy a new machine manufactured at Prodo Pak's New Jersey plant, but instead agreed to buy a used machine in a deal brokered by Mueller. The record is not clear whether Mueller expected to have that machine delivered to the New

---

[9]A leading treatise on the Uniform Commercial Code explains "F.O.B." delivery terms as follows:

> In an important class of cases, the contract will either require or authorize the seller to ship the goods, but will not require the seller to deliver them at a particular location. The most common of these are contracts that include the symbols "F.O.B. seller's plant" or "F.O.B. seller's city." The place of delivery in such contracts (and those that include equivalent language) is the place where the facilities of seller's carrier are located, for the seller must put the goods into the possession of the carrier. In the jargon of commercial lawyers, a contract that authorizes the seller to send the goods to the buyer but does not require that the seller deliver them at any particular destination is called a "shipment contract." Generally, in shipment contracts, risk of loss passes to the buyer at the point of shipment, which is also the point of "delivery" . . . .

1 James J. White and Robert S. Summers, *Uniform Commercial Code* § 3-5 at 207-08 (5th Ed. 2006) (quotation and footnote omitted).

Jersey plant or instead directly to Bellisio. But nothing in the record suggests that, at the time that Mueller entered into the contract with Bellisio, he had reason to believe that the machine would be delivered to Minnesota. It is true that Conner made his final offer to buy the machine for $80,000 from Minnesota — but Mueller did not know this when he accepted the offer. One does not purposefully avail oneself of the privilege of doing business in Minnesota by negotiating a contract with someone who is secretly a Minnesota resident.

The very function of the purposeful-availment requirement is to ensure that defendants are able to decide freely whether to engage in actions that might subject them to jurisdiction in a foreign forum. This is why the availment must be purposeful rather than fortuitous, random, or attenuated. As *World-Wide Volkswagen* held, due-process-based limitations on personal jurisdiction "allow[] potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." 444 U.S. at 297. In particular, a defendant that purposefully avails itself of the privilege of conducting activities in a particular state "can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *Id.* And a defendant can entirely avoid the risk of burdensome litigation by refusing to do business with the state's citizens in the first place.

But by the time Mueller learned, on January 3, 2007, that the machine was destined for Arden in Minnesota, he could not freely choose whether to deliver the machine to a carrier for shipment to Minnesota. Prodo Pak had agreed to sell the machine to Bellisio for $80,000, and the parties had not specified a delivery term. If Prodo Pak had wanted to avoid any connection with Minnesota, it could have done so only by breaching its contract to sell the machine to

Bellisio.  In effect, Prodo Pak and Mueller were trapped into doing business with a Minnesota resident.

This case is therefore very different from *Papachristou v. Turbines, Inc.*, 902 F.2d 685 (8th Cir. 1990), on which Bellisio relies.  Bellisio Mem. Opp. Mot. Dism. at 8 [Docket No. 23]. *Papachristou* involved an agreement between Papachristou and Turbines, Inc. to jointly buy an airplane engine located in Texas.  Papachristou was located in Arkansas, and Turbines was located in Indiana.  They agreed that Turbines would ship the engine from Texas to Arkansas but, as it turns out, they disagreed over whether some part of it then would be shipped onward to Indiana.  When a Turbines employee tried to drop off *part* of the engine with Papachristou in Arkansas, he refused delivery, contending that he should get the *whole* engine.  *Id.* at 686. Papachristou then sued Turbines for breach of contract.

The Eighth Circuit held that Turbines' single attempted delivery of the engine in Arkansas was sufficient to support personal jurisdiction over Turbines in Arkansas in Papachristou's breach-of-contract suit.  The court said:

> The side trip to Marion[, Arkansas], which can hardly be called accidental, was for the purpose of carrying out the contract that the parties had previously made. Surely the place of delivery is a material term of the contract, in this case placing the expense of delivery on the seller. The contact with Arkansas was on a single occasion, but the contract in suit was for a single piece of property.

*Id.*  As this passage makes clear, Turbines knew when it contracted with Papachristou that the engine was to be delivered in Arkansas, and Turbines was responsible for the costs of the delivery.  Accordingly, Turbines purposefully availed itself of the privilege of doing business in Arkansas.

In this case, by contrast, the place of delivery was not specified when Bellisio and Prodo Pak entered into their contract of sale, and there is no evidence that Prodo Pak was responsible for delivery costs. Moreover, as noted, there is no evidence that defendants even knew that Bellisio had a connection to Minnesota until after defendants had already entered into the contract and accepted payment for the machine. Defendants' connection to Minnesota was therefore inadvertent, not purposeful; it resulted from the unilateral decision of Bellisio that the machine should be shipped to Arden. *Cf. Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982) ("The use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot alone provide the 'minimum contacts' required by due process.").

The post-contract communications between defendants and Bellisio do not change this analysis. Those contacts all arose after the initial contract of sale, by which time defendants had little choice but to deal with Bellisio's Minnesota staff. Further, the parties' discussions about a refund of the sale price are analogous to settlement discussions, which are generally not considered "contacts" for jurisdictional purposes.[10] *See Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE) Ltd.*, 89 F.3d 519, 524 (8th Cir. 1996) ("[C]ourts have hesitated to use unsuccessful settlement discussion as 'contacts' for jurisdictional purposes."); *KSTP-FM, LLC v.*

---

[10]At oral argument, Bellisio contended that Mueller, by agreeing and then failing to return $80,000 to Bellisio, committed the independent tort of fraudulent misrepresentation. Bellisio argued that this tort claim provides a basis for jurisdiction over defendants.

Setting aside the dubiousness of such a claim — Bellisio could not explain how it relied to its detriment on Mueller's representation about *refunding* its money — Bellisio does not raise the claim in the amended complaint. The Court therefore need not consider whether a fraudulent-misrepresentation claim against defendants arising out of contacts that did not occur until after the contract was breached could support the Court's exercise of personal jurisdiction.

*Specialized Commc'ns, Inc.*, 602 N.W.2d 919, 925 (Minn. Ct. App. 1999) ("[I]t would be inappropriate to treat [the defendant's] subsequent contacts with Minnesota as a basis for exerting personal jurisdiction when those contacts occurred solely as part of an effort to settle a dispute.").

Because defendants did not purposefully avail themselves of the privilege of doing business in Minnesota, the Court need not consider whether exercising personal jurisdiction over them might otherwise be reasonable. Without purposeful availment on the part of defendants, the Due Process Clause does not permit the Court to exercise jurisdiction over them.

### *B. Venue*

Defendants assert that venue is improper and move the Court, if it does not grant their motion to dismiss, to transfer this action under 28 U.S.C. § 1406(a) to the United States District Court for the District of New Jersey.[11]  Def. Mem. Supp. Mot. Dism. or Transfer at 2 [Docket No. 16]. Because the Court grants defendants' motion to dismiss, their motion for transfer is moot.[12]

---

[11] The Court agrees with Bellisio that defendants have not asked for a transfer under 28 U.S.C. § 1404(a), which applies when venue is proper in the court in which the case was filed but "the interest of justice" support transferring the case to a different district where it could have been brought.

[12] Bellisio could have moved for a transfer under 28 U.S.C. § 1406(a) or 28 U.S.C. § 1631 in the event that it lost on the jurisdictional question. *See* 14D Charles Alan Wright et al., *Federal Practice and Procedure: Civil* § 3827 at 568 (3d ed. 2007) ("Section 1406(a) is broad enough to authorize the transfer of a case 'whether the court in which it was filed had personal jurisdiction over the defendants or not.'") (quoting *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962). But Bellisio did not do so.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of defendants Prodo Pak Corp. and John W. Mueller to dismiss for lack of personal jurisdiction [Docket No. 20] is GRANTED.

2. The alternative motion of defendants Prodo Pak Corp. and John W. Mueller to transfer [Docket No. 20] is DENIED AS MOOT.

3. Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: November 4 , 2008                    s/Patrick J. Schiltz
                                            Patrick J. Schiltz
                                            United States District Judge